IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2018 Session

## STATE OF TENNESSEE v. SANTORY ALEXANDER JOHNSON

**Appeal from the Criminal Court for Hamilton County**
**No. 290718    Thomas Greenholtz, Judge**

---

### No. E2017-00361-CCA-R3-CD

---

The Defendant, Santory Alexander Johnson, was convicted by a jury of one count of second degree murder. On appeal, the Defendant contends that (1) the trial court erred in failing to declare a mistrial or issue an adequate curative instruction following prosecutorial misconduct during closing arguments; (2) the trial court erred in allowing a witness to testify about statements made by the victim; (3) the trial court erred in allowing a redacted convenience store video to be entered into evidence; (4) the trial court erred in re-playing a 9-1-1 recording already admitted into evidence; (5) the trial court erred in allowing inflammatory autopsy photographs to be entered as evidence; (6) the cumulative effect of these evidentiary errors was not harmless; and (7) the trial court erred in failing to properly consider mitigating factors at the Defendant's sentencing hearing.[1] Following our review, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Christina Renee Mincy (on appeal) Chattanooga, Tennessee; and Amanda B. Dunn and Elizabeth Lee Epps (at trial), Chattanooga, Tennessee, for the appellant, Santory Alexander Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; M. Neal Pinkston, District Attorney General; and Cameron B. Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

---

[1] For clarity and ease of discussion, we have reordered the issues as they are set forth in the Defendant's brief.

# FACTUAL BACKGROUND

This case arose after the shooting death of the victim, Christopher Jones, on October 4, 2013.  On February 19, 2014, the Hamilton County grand jury charged the Defendant with one count of first degree murder and one count of possession of a firearm with a violent felony conviction.  See Tenn. Code Ann. §§ 39-13-202; -17-1307.  The firearm charge was later dismissed, and the Defendant proceeded to a trial on the first degree murder charge on October 27, 2015.

## I. Trial

At trial, Chris Gainer testified that he was employed with the Hamilton County 9-1-1 Center as a custodian of records for 9-1-1 call recordings.  Mr. Gainer said that there were multiple calls to the 9-1-1 center regarding an incident on October 4, 2013.

Mr. Gainer explained that the first call came in at 11:24:17 p.m. from telephone number 1157.[2]  The prosecutor played this first call for the jury:

Operator: 9-1-1, what's the location of your emergency?

. . . .

Caller: On Chandler Avenue, a dude just got killed.

Operator:  Where on Chandler?

. . . .

Operator:  Okay, you just said a man got killed.  Got killed where?

Caller:  4012 on Chandler.

Operator:  4012.  Was he shot?

Mr. Gainer testified that the second call regarding the October 4 incident was received at 11:24:29 p.m. from telephone number 0496.  The prosecutor played this call for the jury:

Operator:  9-1-1, location of your emergency?

Caller: We're on Chandler Road . . . .  40th and Chandler.  Ma'am, please [send] an ambulance, please, please.

Operator:  Okay.  What happened?  What happened?

Caller: He's been shot.  Somebody's been shot.

Operator:  Okay, you said 40th and Chandler?

Caller:  Please, please ma'am.

---

[2] For purposes of anonymity and clarity, we will refer to telephone numbers using the last four digits only.

Operator: Okay, I've got them coming. They're coming. Okay I need you to take a deep breath. Are they breathing? Hello?

. . . .

Operator: Okay, the person who was shot, where are they at? Where's the victim at?

Caller: He's there in the street . . . . Oh, please, please.

Operator: Okay, are they breathing?

. . . .

Caller: He's not breathing.

Mr. Gainer explained that the next call to the 9-1-1 center was received at 11:25:34 p.m. from telephone number 0496. The prosecutor played this call for the jury:

Operator: 9-1-1, location of your emergency?

Caller: 4012 Chandler Avenue.

. . . .

Operator: Okay, what's going on there?

Caller: Somebody just got killed.

Operator: Okay, is the suspect still on the scene?

Caller: Nope. You all going to send the police or what?

Operator: I'm going to send somebody. I need you to tell me what's going on. Is there somebody still there?

Caller: Yeah, the man on the street!

Operator: Okay, is the person who shot him still there?

Caller: No.

Operator: Which way did he go?

A record of all three calls was marked as an exhibit and entered into evidence.

Amber Rushing testified that in October 2013 she lived with the victim and their two sons on Chandler Avenue. Ms. Rushing explained that the Defendant and the victim had been friends for years and that the Defendant lived "four houses down" on Chandler Avenue. Ms. Rushing said that on October 4, 2013, the victim was at the Defendant's house gambling and that she was at a friend's house located approximately one block away from the Defendant's house. She explained that she knew the victim was at the Defendant's home because she had spoken with him on the telephone several times that day. Ms. Rushing testified that at approximately 10:00 p.m., the victim texted her using his cell phone and asked her for a ride home. Ms. Rushing said that when she received the victim's text, she was already in a vehicle with the victim's cousin, Deontra Balding, who was the driver, the victim's grandmother, Deborah Williams, and another one of the

victim's cousins, Shrondrika Jones.  When asked what happened when they arrived at the Defendant's home, Ms. Rushing explained,

> When we pulled up, [Mr. Balding] was like in the – he pulled up in the middle of the road because there were several cars parked along both sides of the street.  And when we pulled up [the Defendant] was standing by the fence and he told [Mr. Balding] he needed to move his car out of the middle of the street.  But he said it like in a joking way.  And we all kind of just laughed it off.  [Mr. Balding] laughed it off.  And he was like, well, I got something that can make you move this car out [of] the middle of the street.  And he pulled out a gun and shot it in the air.  So we all kind of w[ere] just like, you know, what was that for, just looking like we really didn't know what that was for.

Ms. Rushing testified that there were about thirty people at the Defendant's house that evening and that his house was known to be a "gambling house" with "a lot of people hanging out down there[.]"  Ms. Rushing explained that she was sitting in the back seat of the vehicle when the Defendant fired the shot "in the air."  She said that she did not see the gun that the Defendant used and that the Defendant only fired one shot.  When asked what happened after the Defendant fired the shot, Ms. Rushing said, "[The victim] told [the Defendant] he was tripping.  That his family and his granny w[ere] in the car.  And [the Defendant] said, my bad, hey, Granny.  Like spoke to his granny.  And that was really it."  Ms. Rushing testified that the victim appeared to be angry as he got in the back seat of the vehicle and that they then drove to another house approximately two minutes away.  She explained that once the vehicle stopped at the second residence, all of the occupants got out of the car.  The victim asked Ms. Rushing for the keys to her car, a white Ford Taurus.  The victim then drove Ms. Rushing's car back to the Defendant's house.

Ms. Rushing explained that she was afraid there was "going to be an altercation[,]" so she began walking back to the Defendant's house.  She explained,

> I started walking on the railroad tracks . . . along the side of Chandler Avenue.  While I was walking I could hear yelling.  I couldn't hear actually what was being said, but I could hear people yelling.  And I heard a gunshot.  And then like a long pause in between.  And I kind of like just stopped in my tracks when I heard the first one.  And then I hear several more like a few seconds later.  And I took off my shoes and started running.

Ms. Rushing said that she heard "[m]aybe ten" gunshots total.

Ms. Rushing explained she began running to Chandler Avenue and that she noticed that as she approached, "cars were leaving like frantically" and people were "in a rush to get away from the scene." When she arrived at the scene, Ms. Rushing saw the victim lying in the middle of the street. She said that she also saw her car parked in the middle of the road with the headlights on and the driver's side door open. Ms. Rushing approached the victim, who did not appear to be breathing and had blood on his t-shirt. When asked if she saw injuries on the victim, she replied, "I couldn't really tell. I just s[aw] the blood everywhere." Ms. Rushing stated that she began screaming for help and that the paramedics arrived about ten minutes after she found the victim. Ms. Rushing remained with the victim until he was placed in an ambulance. Ms. Rushing explained that she did not speak to police at the scene because her "main concern was" making sure the victim "was okay." Ms. Rushing said that she never spoke to the police about what occurred, but she did eventually speak to the district attorney's office in 2013 near the time of the preliminary hearing for this case.

Ms. Jones testified that the victim was her cousin and that on October 4, 2013, she was living in Hamilton County. Ms. Jones identified the Defendant and stated that she knew him as well. She testified that on October 4, 2013, she was in the car when they picked up the victim at the Defendant's house at approximately 10:00 p.m. She confirmed that Ms. Rushing, Mr. Balding, and Ms. Williams were in the car with her. Ms. Jones explained that the following occurred when they arrived at the Defendant's house:

> When we pulled up [the Defendant] came to the sidewalk and told [Mr. Balding to] pull over the car. . . . [W]e looked at each other because we didn't understand why he was telling him to pull over the car because [the victim] was walking right out into the street to get in the car, and we w[eren't] blocking traffic or anything. So once [the Defendant] told him to pull over the car, he you know he looked at him – [Mr. Balding] looked at him and was asking him to pull over the car for what. And [the Defendant] turned around and told [the victim] to tell[ Mr. Balding] to pull over the car. And [Mr. Balding] was like he can't make me pull over the car and [the Defendant] was like, well, I got something that will make you pull over this car. And that's when he pulled out the gun and fired into the air.

Ms. Jones stated that after the Defendant fired a shot into the air, the victim said to the Defendant, "You tripping, my grandmother's in the car." The Defendant objected to this testimony on the basis of hearsay, but the trial court overruled the objection.

Ms. Jones continued her testimony and explained that the Defendant apologized to the victim's grandmother, the victim got in the car, and they drove away from the Defendant's house. Ms. Jones said that once they all got out of the car, the victim said that he was going to go back to the Defendant's house and "see what all that was for because they w[ere] friends and [the victim] didn't understand . . . the point of [the Defendant's] shooting a gun in the air."

Ms. Jones testified that the victim got in a white car, which belonged to Ms. Rushing, and that he drove away. Ms. Jones and Ms. Rushing started walking down the railroad tracks toward the Defendant's home. As they were walking, they heard gunshots. Ms. Jones initially began running back toward her own home when she heard the gunshots, but she turned around and went back toward the Defendant's house after she realized that Ms. Rushing had gone toward the Defendant's home. When she arrived at the scene, Ms. Jones observed Ms. Rushing standing near the victim, who was lying in the street. Ms. Jones gave a statement to police officers who had arrived at the scene, but she was not one of the 9-1-1 callers.

Rodney Southers testified that he witnessed the victim's murder. Mr. Southers identified the Defendant and explained that he had known the Defendant for "twenty something years" and that they lived on the same street. Mr. Southers also testified that he knew the victim and that they had known each other for approximately fifteen years. Mr. Southers explained that on October 4, 2013, he was at the Defendant's residence on Chandler Avenue drinking and "playing cards and domino[es]." He said that both the Defendant and the victim were at the home that evening. When asked if an incident occurred between the Defendant and the victim, Mr. Southers stated,

> Somebody came . . . to pick up [the victim,] and [the Defendant] . . . shot in the air. And when he shot in the air, [the victim] told him that his grandmomma was in the car and [the victim] got in that car and left. When [the victim] left, [the victim] came back. When he came back, he walked up [on the Defendant] asked him why was he shooting that gun, his grandmother was in the car. They got into a little argument[,] but it wasn't nothing like that. [The Defendant] told him please leave his yard. [The victim] said I'll leave your yard, just don't put your hands on me, you know what I'm saying. He [was] like, man, that's my family, you ain't got no business doing that s - - t . . . I'll die for my family.

> [The victim] started going to go get in the car. When he . . . start[ed] get[ting] in the car, they still had a little back and forth little argument about it, but nothing . . . too heated. . . . [The victim] was fixing to get ready to leave and [the Defendant] started shooting.

-6-

Mr. Southers further explained that when the victim returned to the Defendant's house, he was alone in "a little white car." Mr. Southers reiterated that the last thing he heard the victim say was, "I'll die for my family[,]" to which the Defendant replied, "[O]h, you'll die for your family." Mr. Southers stated that the victim was seated in the driver's seat when the Defendant began shooting at him. According to Mr. Southers, the Defendant also walked around to the other side of the vehicle and shot at the victim through the passenger window. Mr. Southers testified that he did not know what happened to the Defendant after he shot the victim. He explained that the victim crawled out of the vehicle and fell on the ground. Mr. Southers went over to the victim "to see if he was alright" but left the scene before the police arrived.

Charlotte Pinkteron testified that she knew both the victim and the Defendant. She explained that she was at the Defendant's house on October 4, 2013, "gambling, playing cards" and that both the victim and the Defendant were present. When asked if anything strange happened that night, Ms. Pinkerton stated,

> The first thing that happened, I came in and I started playing cards and [the Defendant] was kidding me about something that had happened a while back. We played cards and [the victim] got broke, he got up and left. [The victim] started to leave, he went out to the car, someone was there to pick him up. Someone got out of the car and started to get in the backseat and he was getting in the car to drive away. [The Defendant], he asked where you going fool and he shot toward the car.

Ms. Pinkerton explained that the victim got in the vehicle and left the scene but returned a little while later in a white Ford Taurus. The victim walked up to the Defendant and demanded to know why he "disrespect[ed] him like that with his family in the car" and told the Defendant that he would "die for [his] family." The Defendant asked the victim to leave, and the victim got into his car. After the victim was seated in his car, the Defendant began shooting at him through the driver's side window. Then, the Defendant walked around to the other side of the car and began shooting at the victim again. The victim got out of the car and began running. He ran approximately twelve feet before collapsing in the street, and the Defendant left the scene and ran "toward the fence line."

Ms. Pinkerton said that she used her cell phone to call the police to report the shooting. At this point, the prosecutor re-played the 9-1-1 call previously played and entered into evidence. Ms. Pinkerton remained on the scene until the police and paramedics arrived. Ms. Pinkerton was transported to the police station, where she gave a statement to Detective Fuller. Ms. Pinkerton asserted that the victim never threatened the Defendant nor did he appear to have a weapon.

Following Ms. Pinkerton's testimony, her statement to Detective Fuller was played for the jury. The content of the interview was similar to Ms. Pinkerton's trial testimony; however, she told Detective Fuller that she did not see what vehicle the victim was driving when he returned to the Defendant's house. She did tell Investigator Fuller that when the victim attempted to leave the Defendant's house, he got into the driver's seat of a white car.

Charles Fuller testified that he had known the Defendant for "over twenty years." Mr. Fuller explained that in October 2013, he was retired but "helped out" at a convenience store located in close proximity to the Defendant's home. When asked if he saw the Defendant on the evening of October 4, 2013, he explained that the Defendant came into the convenience store, appeared to be in a rush, took a pack of cigars from Mr. Fuller, and quickly left. Mr. Fuller asserted that he had reviewed the store surveillance video from that night and stated that it accurately depicted his interaction with the Defendant. The prosecutor then played a redacted version of the video, which depicted the Defendant's walking up to the check-out counter inside the convenience store and the clerk's handing him an item.

Investigator Jerry McElroy testified that he was a crime scene investigator with the Chattanooga Police Department (CPD). He explained that his primary duties were to document crime scenes and collect and preserve evidence. The prosecutor showed Investigator McElroy multiple photographs of the crime scene on Chandler Avenue, which were identified and entered into evidence as Exhibit Numbers 2-24.

Kendall Stoner stated that she was employed with the Tennessee Bureau of Investigation (TBI) as a "Special Agent Forensic Scientist in the Forensic Biology Unit, the DNA unit[,]" and she offered testimony as an expert in DNA testing. Agent Stoner testified that she determined that a swab of blood taken from Chandler Avenue matched the DNA profile of the victim. Agent Stoner also conducted DNA analysis on a white t-shirt with "some reddish-brown stains" found near the scene of the crime. Agent Stoner determined that the white t-shirt contained blood from the victim. Agent Stoner was also able to determine that a blood sample taken from the driver's seat of the white Ford Taurus matched the victim's DNA profile.

Agent James Russell Davis II explained that he was a "Special Agent and Forensic Scientist" for the TBI and testified as an expert in microanalysis. Agent Davis explained that testing revealed the presence of "gunshot primer residue" on the exterior of the driver's side door of the Ford Taurus. The lab report containing these test results was entered into evidence.

-8-

Kevin Warner, a Special Agent Forensic Scientist for the TBI, offered testimony as an expert in firearms analysis. Regarding this case, Agent Warner received five bullets and six cartridge cases to analyze. Two of the bullets were recovered from the Chandler Avenue crime scene, two were recovered from the white Ford Taurus, and one was removed from the victim. Agent Warner determined that all of the bullets were .45 calibers and that they were all fired from the same firearm. Although Agent Warner never received a weapon to analyze in this case, he was able to determine that the firearm was a semi-automatic weapon and could possibly have been "a Taurus, Eagle Arms[, or] Wesco Ordnance." Agent Warner then conducted a demonstration of the operation of a Taurus handgun in the courtroom.

Investigator Lucas Fuller testified that he was employed as a CPD homicide detective and that he was working on October 4, 2013. He responded to the shooting on Chandler Avenue, searching the area near the crime scene for the shooter. Investigator Fuller did not find a suspect and proceeded to 4000 Chandler Avenue. Upon arrival, he spoke with Ms. Jones. Investigator Fuller also spoke with a police officer already on the scene, who provided him with information regarding the victim. Investigator Fuller then began to view the crime scene with the crime scene technicians. Investigator Fuller noticed a white Ford Taurus with an open driver's side door parked on the street at 4000 Chandler Avenue. He found multiple shell casings and projectiles around the car. He located blood on the driver's side of the car, inside the driver's side door, and in the street. Investigator Fuller returned to the police station where he interviewed five individuals who had been present at the Defendant's residence at the time of the shooting. After personally interviewing each of these people, Investigator Fuller obtained an arrest warrant for the Defendant.

Investigator Fuller was not able to locate the Defendant on that date. He sent a wanted poster of the Defendant throughout the CPD and contacted the department's "fugitive division." Ultimately, the Defendant was located on October 8, 2013, when police officers responded to a telephone call in which the Defendant stated "that he needed to turn himself in because he was wanted for murder" and that unnamed individuals were shooting at him.

Police officers arrested the Defendant and took him to the police department. The Defendant signed a waiver of rights form in which he agreed to speak to Detective Fuller without an attorney present, and this document was entered as an exhibit. Detective Fuller recorded his interview of the Defendant, and the recording was entered into evidence. During the interview, the Defendant admitted that there was gambling at his house on the night of the murder but denied shooting the victim. The Defendant explained that the reason he called the police was that unidentified persons, who knew that the Defendant was suspected of murdering the victim, were shooting at him.

Dr. Steven Cogswell stated that he was employed at the Hamilton County Medical Examiner's Office and testified as an expert in forensic pathology. Dr. Cogswell performed the autopsy on the victim and identified the relevant autopsy and toxicology reports, which were entered into evidence. Dr. Cogswell concluded that the victim's manner of death was homicide and that the probable cause of death was multiple gunshot wounds. He testified that he determined the victim received a total of four or five gunshot wounds. These included gunshot wounds to the victim's neck, right upper arm, right forearm, leg, and a grazing gunshot wound to the torso. Dr. Cogswell explained that the torso wound might have actually been a continuation of one of the arm wounds. He also testified that the wounds were consistent with "someone . . . in a sitting position." Dr. Cogswell stepped down from the witness stand and demonstrated how the victim might have been positioned when he was shot based on information gathered during the autopsy. Dr. Cogswell also drew a "wound diagram" as part of the autopsy, which included the entrance and exits of the gunshot wounds and dotted lines representing the pathways of bullets. Dr. Cogswell identified photographs he took of the victim's body depicting the gunshot wounds, and these were entered into evidence.

At the conclusion of the trial, the jury found the Defendant guilty of one count of the lesser-included offense of second degree murder.

## II. Sentencing Hearing

A sentencing hearing was held on February 10, 2016. Sherita Burch, the victim's mother, testified in accordance with her victim impact statement, which was submitted with the presentence report. The prosecutor and defense counsel each offered arguments regarding enhancement and mitigating factors. After considering Ms. Burch's testimony, arguments from the parties, the presentence report, and the presence of any enhancement and mitigating factors, the trial court sentenced the Defendant to forty years' incarceration to be served in the Tennessee Department of Correction. The Defendant filed a motion for new trial, which was denied, and followed by a timely notice of appeal.

## ANALYSIS

### I. Closing Argument

The Defendant contends that the prosecutor made improper comments regarding the Defendant's right not to testify during closing arguments. Specifically, the Defendant argues that the prosecutor inappropriately addressed the Defendant during closing arguments and that "the prosecutor's statement and body language could only have been understood as a declaration that the [Defendant] would not answer such questions in the

presence of the jury because the [Defendant] purportedly knew he was guilty." The Defendant argues that the jury "would necessarily have taken it to be a comment on the [Defendant's] exercise of his right not to testify." The State responds that the Defendant has waived review of this issue by failing to raise a contemporaneous objection.

During his rebuttal closing argument, the prosecutor commented on the fact that the Defendant left his home after the victim was murdered and never returned. The prosecutor also argued that the Defendant disposed of incriminating evidence before turning himself over to the police and made the following statements:

> Why do you get rid of clothing? Why do you buy new clothes?[3] It's because you know you're guilty. It's because you know there's evidence on there or there's a possibility that evidence could be on there. Why didn't you just let him go, just let him leave? We wouldn't be here.

First, we conclude that the Defendant waived review of the issues regarding the prosecutor's comments and the trial court's failure to take action by denying a mistrial or issue a curative instruction. Here, the Defendant failed to raise a contemporaneous objection during closing argument, thus waiving plenary review of his claim on appeal. See Tenn. R. App. P. 36(a) (providing that appellate relief is not available for a party who "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error"); State v. Robinson, 146 S.W.3d 469, 518 (Tenn. 2004) (holding that the issue of prosecutorial misconduct during closing argument is waived if the defendant does not make a contemporaneous objection). Accordingly, the Defendant is not entitled to relief on appeal unless the prosecutor's remarks constitute plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). The State contends that the Defendant has not shown his entitlement to plain error relief.

There are five factors that must be established before an error may be recognized as plain:

> (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the issue was not waived for tactical reasons, and (5) consideration of the error is necessary to do substantial

---

[3] We note that there was no explicit testimony that the Defendant disposed of his clothing from the night of the shooting. A t-shirt with the victim's blood was found near the crime scene, and the Defendant is wearing what could possibly be a different shirt in the surveillance video from the convenience store.

justice.

State v. Minor, 546 S.W.3d 59, 70 (Tenn. 2018) (citing State v. Martin, 505 S.W.3d 492, 504 (Tenn. 2016); State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010)). The burden is on the defendant to establish all five factors, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Id. Furthermore, the error must be "clear" or "obvious," State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007), and must be of "such a great magnitude that it probably changed the outcome of the trial." State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000).

Our supreme court has summarized prosecutorial misconduct regarding closing arguments as follows:

> The basic purpose of closing argument is to clarify the issues that must be resolved in a case. State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008). While "argument of counsel is a valuable privilege that should not be unduly restricted," Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975), "such . . . arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); see also State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 29.2, at 97 (2008), leeway should be given regarding the style and substance of the argument. Banks, 271 S.W.3d at 131; State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." Banks, 271 S.W.3d at 131.

State v. Sexton, 368 S.W.3d 371, 418-19 (Tenn. 2012).

The court has also advised that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. Banks, 271 S.W.3d at 131 (citing United States v. Young, 470 U.S. 1, 11-13 (1985); State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). "An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." Id. (citing State v. Thacker, 164

-12-

S.W.3d 208, 244 (Tenn. 2005) (appendix); State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998)); see also State v. Reid, 164 S.W.3d 286, 321 (Tenn. 2005).

Here, consideration of the prosecutor's comments is not necessary to do substantial justice. Multiple witnesses testified to seeing the Defendant shoot the victim multiple times as the victim attempted to leave. Forensic evidence is consistent with the victim's being shot while seated in the driver's seat of his vehicle, which further corroborated witnesses' testimony that the victim was seated in his vehicle when the Defendant shot him multiple times. Moreover, forensic testing confirmed that all bullets found at the scene were fired from the same weapon, and Dr. Cogswell testified that it was likely the victim was seated when he was shot multiple times. Regardless of the improper nature of the prosecutor's statements, the Defendant is not entitled to relief on this issue.

## II. Evidentiary Issues

The Defendant argues that the trial court erred in admitting into evidence the following: (1) Ms. Jones's testimony regarding the victim's statements; (2) the redacted convenience store video recording; (3) Ms. Pinkerton's testimony and 9-1-1 recording; and (4) the autopsy photographs. The State responds that the trial court properly admitted these items into evidence "because each item was relevant to an issue at trial, and any possible unfair prejudice incurred by its admission did not substantially outweigh its probative value." The State further argues that even had the trial court erred regarding admission of any evidence "it was harmless under the circumstances."

### A. Ms. Jones's Testimony

The Defendant argues that the trial court abused its discretion in overruling his objection regarding Ms. Jones's testimony about the victim's statement. Specifically, the Defendant argues that the statement, "[y]ou tripping[,]" "unambiguously worked to prove the truth of the matter asserted that [the Defendant] was in some upset or agitated state." The State responds that the trial court properly admitted into evidence Ms. Jones's testimony referencing the victim's statement because the statement was not hearsay and was offered "to show the effect of the victim's statement on the [D]efendant."

During Ms. Jones's trial testimony regarding the victim's statement to the Defendant, defense counsel objected to Ms. Jones's testimony based on hearsay. The State responded that nothing in the statement was being offered for the truth of the matter asserted but rather it was offered to show the effect on the Defendant at that time. The trial court overruled the objection, finding that nothing was being offered for the truth of the matter asserted.

-13-

"Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. The questions of whether a statement is hearsay or fits under one of the exceptions to the hearsay rule are questions of law and subject to de novo review by this court. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

This court has held that statements used to prove the effect on a listener are not hearsay:

> [A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement.

State v. Carlos Jones, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *14-15 (Tenn. Crim. App. Sept. 30, 2010) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence, § 8.01[7], at 8-23 (5th ed. 2005)); see generally State v. Venable, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (noting that the victim's statement was not hearsay because it was offered for its effect on the hearer, the defendant, and established evidence of his motive in returning to the scene of the crime later in the day and threatening the victim).

Here, the trial court determined that Ms. Jones's testimony was not hearsay because it was not offered to prove the truth of the matter asserted. We agree. As the State noted, the statement was offered to show the effect on the Defendant. Therefore, the statement was not hearsay because those statements were not offered for the truth of the matter asserted. Tenn. R. Evid. 801(c).

## B. Convenience Store Video

The Defendant argues that the trial court abused its discretion in admitting the redacted convenience store video into evidence. Specifically, he argues that the video "provided no insight as to [the Defendant's] state of mind" and "the video was unduly prejudicial under" Tennessee Rule of Evidence 403, concluding that "the miniscule probative value of this video was significantly outweighed by its prejudicial effect." The

-14-

State responds that the trial court properly admitted the recording because "it was relevant to show that the [D]efendant was not only in the area after the shooting, but showed his demeanor and state of mind shortly after the offense." We agree with the State.

During trial, the prosecutor addressed the trial court and explained that he intended to call a convenience store clerk, Charles Fuller. The prosecutor also said that he intended to use this witness to introduce a redacted store surveillance video recording. He explained that he believed this witness's testimony would be relevant to show that the Defendant was in the area near the victim's murder and "relevant to show [the Defendant's] demeanor and state of mind shortly after the offense." Defense counsel objected, arguing that the Defendant's being in the area was not an issue because there was testimony from other witnesses establishing the location of the murder. Regarding how the video might portray the Defendant's demeanor, defense counsel argued that there was no audio in the video and that "you can't even really see [the Defendant] in the video." The trial court overruled the Defendant's relevance objection and allowed the witness's testimony and video recording, subject to redactions.

The general admissibility of evidence is governed by Tennessee Rules of Evidence 401 and 403. Under these rules, the trial court must determine, first, whether the evidence offered is relevant. Tenn. R. Evid. 401. Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although relevant evidence is generally admissible, see Tennessee Rule of Evidence 402, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[.]" See Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 950-51 (Tenn. 1978). The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 950-51. This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence, 182-83 (2d ed. 1986)).

Here, we agree with the trial court that the video was relevant to show that the Defendant was near the crime scene shortly after the murder. While the Defendant's demeanor is not fully clear in the video, the Defendant is visible in the video and he appears to be in a hurry to obtain items from the store clerk. The Defendant offers little argument as to any prejudicial effect this video recording might have had, and we

conclude that its probative value is not substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51.

### C. Ms. Pinkerton's Testimony and 9-1-1 Recording

The Defendant argues that the trial court abused its discretion in allowing the State to re-play Ms. Pinkerton's 9-1-1 call during her testimony. He argues that this was unduly prejudicial under Tennessee Rule of Evidence 403 and that "the prejudicial effect of playing the recording again vastly outweighed its probative value." The State responds that the trial court did not abuse its discretion in allowing the recording to be played again and "having Ms. Pinkerton identify herself as the caller." The State argues that the Defendant failed to show an abuse of discretion. We agree with the State.

In this case, the 9-1-1 recording had already been marked as an exhibit and entered into evidence. It was re-played after Ms. Pinkerton gave her account of the shooting, and she identified herself as a 9-1-1 caller. While cumulative, we conclude that there is no prejudice to the Defendant in playing the recording again for the jury. Thus, the Defendant is not entitled to relief regarding this issue.

### D. Autopsy Photographs

The Defendant argues that the trial court abused its discretion in overruling his objection to "gruesome and inflammatory autopsy photographs" of the victim. He argues "[t]here was already adequate medical testimony at trial as to the substance of the photographs." Specifically, a "wound diagram" had been introduced "regarding wound locations on the victim's body." The Defendant asserts that the admission of the photographs was improper under Tennessee Rule of Evidence 403 "as the probative value of the photographs was outweighed by the danger of unfair prejudice." The State argues that the autopsy photographs were properly admitted. We agree with the State.

At trial, defense counsel objected to the introduction of these photographs on the grounds that they were gruesome and inflammatory. Defense counsel further argued that the doctor used a diagram and portrayed the same information as the photographs. The prosecutor responded that the location of the gunshot wounds on the victim's body were relevant to show intent and premeditation. He argued, "It's hard for the jurors to visualize gunshot wounds on a diagram of the autopsy report." The trial court found that the photographs were "not especially shocking and reprehensible, particularly in a murder case and that they do go to the nature and extent of the injuries and they're relevant to issues of intent."

"The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." Banks, 564 S.W.2d at 951. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. Id. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. Id. at 949; see also State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

Additionally, our supreme court has held that photographs "taken during or after an autopsy" are problematic "because lay jurors normally do not have the experience necessary to draw correct inferences from the appearance of internal organs." Banks, 564 S.W.2d at 951 (citing State v. Morris, 157 So. 2d 728, 731 (1963)). "In many cases, the facts concerning the injuries and the cause of death may be adequately established and better explained by a pathologist." Id. at 952. However, in Banks, our supreme court acknowledged that a "case can be imagined in which a photograph could supplement the medical testimony to give a better understanding of the number of wounds inflicted and the manner in which the killing was carried out[.]" Id.

Here, Dr. Cogswell used the autopsy photographs to further explain the wound locations on the victim's body. While the photographs depict the victim's multiple wounds, they are not overly gruesome or inflammatory. The State used these photographs to show the various types and severity of the victim's wounds in an attempt to prove premeditation. Because the photographs were not overly gruesome or inflammatory and were used to explain the manner in which the killing was carried out, the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. Thus, the Defendant is not entitled to relief regarding this issue.

### E. Cumulative Error

Finally, the Defendant argues that cumulative evidentiary errors committed during his trial entitle him to a new trial. The State argues that the Defendant has failed to establish cumulative error. We agree with the State.

Under the cumulative error doctrine, our supreme court has stated,

[T]here may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

-17-

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). Therefore, necessarily, "[t]o warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the proceedings." Id.

Here, there was not "more than one actual error committed in the proceedings." See Hester, 324 S.W.3d at 76. Accordingly, we hold that the Defendant is not entitled to relief on the basis of cumulative error.

### III. Sentencing

The Defendant argues that the trial court erred in failing to properly consider mitigating factors in determining his sentence. The State responds that the trial court properly sentenced the Defendant. We agree with the State.

At the sentencing hearing, the Defendant argued for the following mitigating factors, which the trial court declined to apply: (2) the Defendant acted under strong provocation; (11) the offense was committed under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; and (13) any other factor consistent with the purposes of this chapter. Tenn. Code Ann. § 40-35-113.

Regarding mitigating factor (2), the trial court determined that the Defendant did not act under strong provocation because the victim was unarmed, made no overt threat to the Defendant, and attempted to leave the house as instructed by the Defendant. The trial court further reasoned that trial testimony established that as the victim was leaving, the Defendant followed him and began shooting. Thus, there was "not strong provocation as would be indicative under this mitigating circumstance at all."

Regarding mitigating factor (11), the trial court determined that the Defendant had a sustained intent to violate the law as evidenced by the fact that he "had gone on the run" from "October 4, 2013 to October 8, 2013[.]" The trial court further reasoned that the Defendant had multiple opportunities to stop his criminal conduct:

> The fact that [the victim] was leaving the premises as [the Defendant] had requested that he do, demand that he do, and that [the Defendant] continued to follow up and down the path and then to shoot [the victim] inside of the car. Not only in the driver's side but around the back as some testimony indicates, and also through the passenger side window.

The trial court concluded that the Defendant had ample opportunities to "stop and reflect and that a sustained intent to violate the law was likely present."

The trial court also declined to apply mitigating factor (13). The trial court explained that this factor was generally applied to defendants who demonstrate remorse. Here, the trial court found that the Defendant failed to appear remorseful at the conclusion of his trial or at the sentencing hearing. The trial court also considered the fact that the Defendant had made no contributions to the victim's family, even though the victim impact statement indicated that the family had incurred $2,500 in funeral expenses. Finally, the trial court considered the Defendant's failure to admit guilt and determined that the Defendant did "not appear to be" a candidate for rehabilitation "at present."

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Thus, before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the

-19-

sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." State v. Pollard, 432 S.W.3d 851, 862 (Tenn. 2013) (citing Tenn. R. Crim. P. 32(c)(1) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal."); see also Bise, 380 S.W .3d at 705). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

"[T]he 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by— but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Bise, 380 S.W.3d at 706. In accordance with the broad discretion now afforded a trial court's sentencing decision,

> misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id.

We conclude that the Defendant's sentence complies with the purposes and principles of the Sentencing Reform Act. In determining the Defendant's sentence, the trial court considered the Defendant's presentence report, Ms. Burch's testimony, and arguments from the State and the Defendant. Upon consideration of this evidence, the trial court also determined that multiple enhancement factors applied to the Defendant and supported these findings with ample reasoning. Furthermore, we conclude that the trial court did not err in failing to apply the argued for mitigating factors. Thus, the Defendant is not entitled to relief, and we uphold the trial court's sentence.

CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-20-